ALBANY,
April, 1824.

Barker
v.
The People.

JACOB BARKER, plaintiff in error,

*against*

THE PEOPLE OF THE STATE OF NEW-YORK, defendants in
error.

The act to suppress duelling, passed *November* 5, 1816, (*sess.* 40, *ch.* 1,)
which declares that any person convicted of challenging another to fight
a duel, &c. " shall be incapable of holding or being elected to any post
of profit, trust or emolument, civil or military, under this state, is con-
stitutional ; and a conviction and judgment of disqualification under it,
are, therefore, legal and valid.

The provision in the constitution of the *United States*, that cruel and unu-
sual punishments shall not be inflicted, is a restriction upon the govern-
ment of the *United States* only ; and not upon the government of any
state.

The constitution of the *United States* does not regulate the punishment of
crimes against a state.

The state legislature can not establish arbitrary exclusions from office, or
any general regulations requiring qualifications which the state consti-
tution has not required.

The power of the state legislature, in the punishment of crimes, is not a
special grant or limited authority, but a part of the legislative, or sov-
ereign power of the state, to maintain social order, and to take life, lib-
erty and all the rights of both when the sacrifice is necessary.

The provision in the state constitution, that the judgment upon impeach-
ment shall not extend farther than a removal from office, and disqualifi-
cation to hold office, is a restriction, not an authority.

The power of the state legislature, over crimes, is a power to produce the
end by adequate means ;

But there are numerous regulations in the constitution which operate as
restrictions upon this power.

Examples.

Eligibility to office is not so secured.

Infliction of disqualification to hold office, as a punishment, is not incom-
patible with that part of the constitution, which provides that each
house shall be the judge of the qualifications of its own members.

ERROR to the Supreme Court. In *February*, 1822, *Jacob
Barker*, the plaintiff in error, was indicted in the Court of
General Sessions of the Peace, of the city and county of
*New-York*, for sending a challenge to *David Rogers*, to fight
a duel. The indictment contained five counts ; the four
first of which alleged the offence to have been committed
by *Barker*, in the city of *New-York*, on various days, in the

months of *January* and *February*, 1822, " against the form of the statute in such case made and provided," being founded on the act " to suppress duelling," passed the *5th* of *November*, 1816. The fifth count was for a similar offence at common law. The plaintiff in error was tried on the indictment, at the Court of General Sessions, held in the city of *New York*, in *May*, 1822. The jury rendered a general verdict of guilty, and the District Attorney having entered a *nolle prosequi* on the fifth count, (for the offence at common law,) the Court, thereupon, gave judgment, that the plaintiff in error, "*for the offence aforesaid, as charged in the first, second, third, and fourth counts of the said indictment, whereof he is convicted, be incapable of holding, or being elected to any post of profit, trust or emolument, civil or military, under the state of New York.*"

A writ of error was brought, on this judgment, to the Supreme Court, which, in *January* term, 1823, *affirmed* the judgment of the General Sessions. (*Vide* 20 *John. Rep.* 457, *S. C.* which contains the reasons assigned to this Court in support of the judgment.)

*B. F. Butler*, for the plaintiff in error, argued,

1. That the act of the *5th November*, 1816, " to suppress duelling, on which the judgment is founded, is contrary and repugnant to the provisions and spirit of the constitution of this state, in force at the time of its enactment.

2. It is also repugnant to the constitution of the *United States*.

3. It is repugnant to those parts of the amended constitution of this state, which relate to the *right of suffrage*, and which became in force, and took effect from the last day of *February*, 1822 ; and being so repugnant, was abrogated by the amended constitution.

He said, that, before an examination of the points, it might bc useful briefly to consider the history of the act in question. The subject of duelling had, before the passage of this act, been presented in such a variety of lights to the legislature, that they felt themselves called upon for some viggorous provisions against it. The old statute of 1813. (2 *R.*

*ALBANY, April, 1824.*

Barker
v.
The People.

ALBANY,
April, 1824.

Barker
v.
The People.

*L.* 192,) being found ineffectual, the act of *November* 5, 1816, (*sess.* 40, *ch.* 1,) passed the two houses at the previous winter session, and was sent to the council of revision. This act, beside imposing the penalty of disfranchisement, for sending a challenge, &c. provided that an oath should be taken by all officers afterwards appointed, and solicitors, attorneys, counsel, &c. afterwards admitted, that they had not and would not violate the act. This was by the second section; and doubts being entertained as to its constitutionality, it was laid over among the files of the council, till the *November* session, at which time it was approved by a majority of the council, and became a law from that date. Notwithstanding this decision of the council, doubts were still entertained as to its constitutionality; and in the case of *Dox,* a member of the assembly from *Genessee,* the question was discussed in the legislature, and he was denied a seat, because he would not take the oath. A few days after this, a bill passed the assembly repealing the 2d section, but it was rejected by the senate. During the pendency of the bill, the constitutional power of the legislature to make such a law was fully discussed; but the objection was confined to the second section. At the session of the late convention, however, the subject was taken up; the 6th article of the new constitution abolishes the oath; and whatever might have been thought on this subject before, it is now, we believe, pretty generally conceded, that the second section, at least, was unconstitutional. This history is useful, as it establishes, that, in the fervor of the times, the constitution was violated in the second section; and admonishes us, that, from the same cause, it might possibly have been violated in the first.

In discussing the points proposed, it is proper to inquire, generally, what power the legislature possess under the constitution of this state. The late Chief Justice, in delivering the opinion of the Court below, says, that they possess all power, not expressly forbidden by the constitution of this state, or of the *United States,* which relates to the prevention of crime, or the well ordering of society. From this, we, with very great deference, dissent. We contend that they possess the power, only, which is expressly conferred by

ALBANY,
April. 1824.

Barker
v.
The People.

the constitution, or that which results from its provisions by necessary implication. This construction has universally been applied to the constitution of the *United States.* It is said, by the Chief Justice, not to apply here, because our state constitution contains no enumeration of powers. There are but few prohibitions in the state constitution. Our rule admits that when the legislature are not expressly prohibited, they possess all power not repugnant to any express provision, or the fundamental principles of a free government, or in other words, the spirit of the constitution. Thus, the true rule will be found to lie between the two extremes of a power limited by enumeration, or left entirely at large. Indeed, this rule is admitted, in effect, by the Chief Justice ; for, notwithstanding the broad terms of the axiom with which he sets out, he goes on to argue that there is no repugnancy between the provisions of the act and those of the constitution ; at any rate, beyond that provision which makes the assembly judges of their own members. He admits that such a repugnancy would destroy the act *pro tanto.* The 3d article of the original constitution, erecting a council of revision, with powers to guard against the passage of laws contrary to the spirit of the constitution, implies also that such a distinction exists. There are certain acts which the legislature cannot pass, though not expressly prohibited, and though not inconsistent with any express provision of the constitution. (*Calder et ux.* v. *Bull et ux.* 3 *Dall.* 386. *Fletcher* v. *Peck,* 6 *Cranch,* 87, 135. *Green* v. *Biddle,* 8 *Wheat.* 1, 88.) There is nothing which prohibits divesting one man of his freehold and giving it to another ; no provision against retrospective laws ; yet no law can be passed divesting a freehold ; because it is inconsistent with those principles of liberty on which all free governments are founded.

We contend that the act of *November 5th,* 1816, was contrary to several express provisions of the original constitution, particularly the 9th, 10th and 12th articles. The first clause of the 9th article makes the assembly judges of its own members. No particular qualification was required

in a candidate for that house ; though it was perhaps implied that they should have the same qualifications as the elector. But the 10th section required a senator to be a freeholder, which could not be varied by any act of legislation. Could they, for instance, have defined the qualification more particularly by saying that the freehold intended should amount to $250 ? This would violate the rule that an express provision excludes implication. If the legislature had power to require other qualifications, they might subvert the freedom of election. In effect, the duelling act did require a qualification unknown to the constitution. On the 1st of *January,* 1822, the plaintiff in error was eligible to a seat in the assembly or senate. In the latter, he once held a seat. He is now, according to the judgment of a Court of Sessions, ineligible to either branch of the legislature. How has he become so ? The constitution does not recognize the disqualification imposed. It is the same thing as an act requiring 20 years residence of the candidate in a particular county, or a freehold of the value of $1000, or the membership of a cotton factory, as a qualification. Suppose he should present himself to the house of assembly as a member of that body, could they say, " you have all the constitutional qualifications, all which the people required, but not such as the legislature have seen proper to demand ;" and for that reason exclude him ? Do the house of assembly longer retain the power of judging in cases coming within this act ? No. If the act be valid, their power is discontinued ; and the judiciary are to determine the qualifications of members. The late Chief Justice seems to admit that this consequence could not follow ; and that the act is so far void. The 17th and 20th articles, prescribing the qualifications of the governor and lieutenant governor, are equally violated. So of the 29th article, providing that town officers, &c. shall be continued eligible as heretofore ; though there may be some doubt whether this be not confined merely to the manner of their election. The utmost extent of legislative power is to render a man ineligible to such offices alone as are created by the legislature, or left by the constitution for them to create or control.

Can this judgment be good in part and void in part? The late Ch. Justice seems to think it may; and this is true even in criminal cases where the judgment consists of several distinct and independent branches; as where it imposes a fine of 15 dollars, and imprisons for 30 days, (*In the matter of Sweatman*, 1 *Cowen's Rep.* 144.) So in civil cases, where it is divided into costs and damages; but when the judgment is entire, and the good can not be distinguished from the bad, it must be reversed *in toto*.

This act is also repugnant to the 13th article, which forbids the disfranchisement of any member of this state, unless by the law of the land or the judgment of his peers. On this head, the late Chief Justice remarks, that "if the duelling act is not otherwise unconstitutional, then the injunctions of this article have been complied with; for the act is the law of the land, and the verdict is the judgment of the plaintiff's peers." This is a plain case of the *petitio principii*; for though the judgment was under a statute, it does not follow that the proceeding was according to the law of the land, unless the act was constitutional. If it violated the constitution, it was void, and the trial was not such an one by the plaintiff's peers as is known to the law. It is begging the whole question in controversy. Suppose the legislature to pass a law divesting you of the title to one of your farms, and conferring it upon your neighbor; this is equally the law of the land, because it has the form of an act of the legislature. Suppose they should pass an agrarian law, providing that no man shall hold more than 100 acres of land; but if he buys more, it shall be forfeited to his nearest neighbor who has no land; and a jury should find this fact, and a Court give judgment of forfeiture; this would be equally an ouster of private right by the law of the land, and the judgment of his peers. The act must be not only formally, but constitutionally good, or any act which your peers may do under it is a nullity, and as if they had never acted at all.

The late Chief Justice said he did not perceive the application of the 33d article. It was expressly stated by the plaintiff, in his argument before the Court below, that this article confined the disfranchisement or sentence of inelegi-

bility to the impeaching power. (*Vid.* 20 *John.* 457.) It
gives this power to the senate ; and the plaintiff wishes to be
understood as contending, that when a constitution or stat-
ute creates a power, and places it in the hands of a particu-
lar tribunal, to be exercised in a particular manner, all other
tribunals, and all other courses of proceeding, other than
those which are enumerated, are virtually excluded.

The late Chief Justice himself thinks, that the enumera-
tion of offences in the new constitution, for which one may be
deprived of his vote, excludes, by necessary implication, all
others. Now, by the 39th article of the old constitution,
ministers of the gospel were ineligible. Take the late Chief
Justice's own rule, that this enumeration excludes all other
causes of ineligibility ; and this article, alone, would be suf-
ficient ground from which to infer the invalidity of the judg-
ment below. Suppose the legislature should exclude other
classes—lawyers or physicians, for instance—would the
provision be valid ? Here they have excluded duellists, who,
at times, form a very considerable class of the community.

The act is repugnant to the spirit of the constitution. We
have already explained what we mean by this. It is a re-
pugnancy to those principles which lie at the bottom of ev-
ery free government. We do not believe that the people
ever intended to confer this arbitrary power of disfranchise-
ment. We do not believe it, because the power is too migh-
ty to be entrusted with any republican legislature. If they
do possess it, they are omnipotent, like the British parlia-
ment, and able to subvert the liberties of the people. If they
may disfranchise in this, they may in any other case. A
simple assault and battery is an offence of the same legal
grade as sending a challenge, not to mention a great number
of other ordinary misdemeanors of the same rank, some of
which are committed very frequently, and almost with impu-
nity. The legislature may go on in this way, without end,
disfranchising one and another, till the state would be redu-
ced to very narrow limits in its selection of officers. Work-
ing, sporting, or travelling on *Sunday*, or profane cursing
and swearing, may be followed by the same consequences.
They may create new offences, and impose ineligibility, by

ALBANY,
April, 1824.

Barker
v.
The People.

their acts, to protect game and fisheries. We are not to repose on the remoteness of the probability that these things will come to pass. It is the power which is in question—not what they will do, but what they may do. Did the people who delegated the right to frame our original constitution, suffering as they were at the moment under the lawless encroachments of British myrmidons, intend to leave this matter at such loose ends, entrusting their legislature with a power to disfranchise the whole community?

Another fundamental principle of all free governments is, that punishments shall be proportioned to the nature of the offence. This is so treated not only by all enlightened writers on the subject, but it is incorporated as a maxim in various constitutions of the *United States.* Cruel or unusual punishments are not to be inflicted. (8 *Am. to Con. U. S.* 18 *art. Bill of Rights in Con. N. H.* 14 *s. of 8th art. Con. Ohio.*) And though not, in terms, a part of our state constitution, it is one of its fundamental principles, as much as the rule that the freehold of one man shall not be arbitrarily divested and conferred upon another. We do not speak of the power to prescribe punishments, cruel or unusual in themselves, but the act of imposing penalties, of the same undistinguished severity, upon all offences, without distinction as to their nature. The statute in question imposes the same penalty on all who commit the offence of sending a challenge, whatever may be its extenuating circumstances, in whatever class of society it may be committed, whether among the bar, the army, the navy, &c. All are alike disqualified from becoming members of the legislature. The man against whom the sentence is pronounced becomes a slave in a nation of freemen, for an offence which, under some circumstances, should be excused. Its moral guilt depends upon those circumstances. This law, like the tyranny of *Procrustes*, seizes the victim, and adapts him to the bed of justice. A whole life of atonement, for a juvenile freak, can not rescue him from lasting disfranchisement and disgrace. No matter how warm the blood, or great the provocation—whether the challenge be given or accepted—and though the challenge or acceptance be immediately withdrawn—the

same consequences follow.    Such a law violates the eternal principles of morality and of natural justice itself.

It is said, by the late Chief Justice, that disfranchisement is not an unusual punishment.   He does not allude to ineligibility ;  and we think he is mistaken in saying so of disfranchisement, inflicted by the legislature.  We presume he must have alluded to attainders, which are now prohibited by the constitution of the U. States.  He says it was the consequence of treason and of infamous crimes;  but, at any rate, such a consequence is very different from ineligibility.  Till the adoption of the late constitution, there was nothing of this to prevent a citizen's voting or being elected.   Again ;  it may be answered, that he speaks of the matter as it stood at the common law, which, though adopted by the constitution, is, in this respect, altered by the bill of rights.  Probably the statute, (1 *W. & M. c.* 2) which passed in *England*, containing the same clause, referred to certain cruel punishments which were inflicted about the last of the second *James.*   (4 *Bl. Com.* 378.)    But these had long been discontinued, and were not known in this free country, when it was reiterated by the consitution of the *United States*, and the declaration of rights in our own state. (1 *R. L.* 48, *s.* 8.) The punishment in question was unknown to the common law, as it respects this offence.   So far, at least, it was unusual ;  and we have already shown, that applying it to a crime of this grade is cruel.

All the arguments drawn from the old, apply with still greater force under the new constitution.   The trial in the Court of Sessions took place in *May*, 1822 ;  and, by the 9th article of the amended constitution, all its parts which relate to the right of suffrage and the time of election, were then in force.   By the 2d section of the 2d article, laws may be passed excluding from the right of suffrage persons who had been or might be convicted of infamous crimes.   The late Chief Justice admits, that this enumeration, by necessary implication, denies the power in any other cases ;  and that the offence of which the plaintiff has been convicted is not an infamous one ;  but he limits its operation to the direct right of suffrage, and distinguishes this from eligibility.   We

do not contend that the right of voting and being voted for are convertible ; but we do contend that they are common, and that the citizen who has one must necessarily enjoy the other. We shall not stop to comment on the right of suffrage, or examine the full import of the term. It may certainly be extended, however, to the right of voting in the legislature upon the passage of a law ; but we are willing to concede, for the purpose of the present argument, that it means voting at an election. Now, though you may deprive the plaintiff of his own personal vote, you can not deny his fellow citizens the right to vote for him—nor the right to vote for himself; which, under certain circumstances, might become a duty. If the legislature can disqualify for one offence, they may for another ; and thus the argument returns, that this may be extended from one to an hundred, and so on to every member of the community.

In determining a constitutional question of this character, which concerns the liberty of the citizen, every construction should be in favour of that liberty ; and if a doubt exist in the mind of the Court, this great principle should be applied, and judgment be rendered for the plaintiff in error.

*Talcott*, (Attorney General) for the defendants in error. The question for the Court to decide is not whether the act under consideration, or any part of it, be inexpedient, but whether the legislature had a constitutional power to pass the particular section in question. I do not controvert the right of this or any other Court, to entertain the inquiry. I admit it is their duty—but I do say, that the Court will come to a conclusion against the validity of the statute, upon such grounds, with great reluctance ; and not till all doubt be removed from their minds. (*Dartmouth College* v. *Woodward*, 4 *Wheat.* 625. *Calder et ux.* v. *Bull et ux. per Iredell, J.* 3 *Dall.* 399.) I do not controvert the gentleman's limitation of legislative power to that which is consistent both with the letter and spirit of the constitution. It is not necessary for me to contend that the legislature have any power inconsistent either with its words or its spirit, or which is repugnant to the principles of civil liberty. This

act is perfectly consistent with all three ; and, in showing it to be so, I shall not follow the gentleman, with any minuteness, into his doctrine of remote consequences, or examine the force of the language in all the various constitutional provisions which he has considered ; but I shall rely mainly on the evidence to be derived from practical construction, by men who have framed and acted upon constitutions containing the same principles with our own. In *New-Jersey,* an attempt to bribe a Judge or Justice, is punished with fine and imprisonment, and disqualification to hold any office of honor, trust or profit, under that state. (*Laws N. J.* 1821, *p.* 249, 250.) In *Pennsylvania,* sending or carrying a challenge for, or becoming a second in a duel, is punished with forfeiture of all the rights of citizenship for 7 years. (4 *Laws Penn.* 389, *act of* 1794.) The act of 1806, 7 *Laws Penn.* 665-6) re-enacts this law, as to persons sending or accepting a challenge ; and, as to persons carrying, it does not deprive them of *all rights of citizenship,* but only disqualifies them to hold any office of trust or profit under the commonwealth. In *Delaware,* a person elected member of assembly, upon a promise to serve for nothing, or less than the law allows for services, is declared by statute in-capable of serving for that year. (1 *Laws Del.* 148.) In *Virginia,* by a law of 1695, (*vid.* 1 *Statutes at Large,* 131) collectors and their officers receiving, and persons giving bribes, were declared forever incapable of any office or employment within the colony ; and the same disqualification followed, for bribery in relation to any other duties concerning the customs. (*id.* 191.) In 1705, a law passed, that collectors, &c. receiving a bribe to defraud the customs, should forever afterwards be disabled from holding the office, and also be disabled from holding any office or employment relating to the customs. (3 *id.* 232.) In 1785, a law was passed, that if any person elected to serve in the general assembly, should bribe an elector, he should be expelled, and disabled to be re elected during the term of 3 years. (1 *Rev. Code,* 22.) By a law of 1790, the penalty declared for selling a public office, or for taking any thing for a vote in the appointing to any such office, was, in one case, the

loss of the office held, and in the other, incapacity of voting for any candidate for the office sold ; and, if the offender was a member of assembly, expulsion and perpetual disqualification from being elected ; and the person agreeing to buy was declared incapable of serving in the office purchased. (1 *Rev. Code*, 52.) Another law declared, that if candidates for the legislature gave money. meat. drink, or other reward, to promote their election, they should be expelled, and disabled to be elected for 3 years. (1 *Rev. Code*, 389.) By a law of 1810, an oath similar to the one prescribed by the act in question here, was made necessary for all officers ; and a challenger, or acceptor of a challenge, was made incapable of holding or being elected to any post of profit, trust or emolument. civil or military. The statute of *Connecticut* is to the same effect. (*Rev. Law. Con.* 1821, *p.* 161, *s.* 52, 53,) So of *Vermont*. (*A. D.* 1801, 1 *Laws of V.* 367) whose statute also denies the offender the privilege of a freeman generally. (*id.*) The statute of *Massachusetts* is the same, except in limiting the disqualification to 20 years. (1 *vol. Laws Mass.* 367, *A. D.* 1801.) The oath prescribed by the statute of *Illinois*, on this subject, is like ours ; and the offender is made incapable of holding, or being elected to any post of profit, trust or emolument, civil or military. (*A. D.* 1819, *Laws of Illi.* 32.) By a statute of the *United States*, if any person give any bribe or reward, to obtain a judgment or decree of a *U. S.* Judge, on any matter in controversy, both the giver and receiver are subject to fine and imprisonment, at the discretion of the Court, and are perpetually disqualified, by conviction, to hold any office of trust or profit under the *United States*. (2 *L. U. S. Colvin's ed.* 97, *s.* 21, *A. D.* 1790.)

If the statute in question be a violation of the fundamental principles of free government, it is singular that almost every statute book in the *United States* should exhibit examples of the same extravagance, among jurists profound in their learning, and patriots ardent in their attachment to liberty.

Too much stress is laid, by the other side, upon an enumeration of particular qualifications. The Governor, says the original constitution, must be a freeholder. This certainly disqualifies those who are not freeholders ; but does it also imply that no other disqualification can exist beyond the one mentioned ? The 13th article declares, that no citizen of this state shall be disfranchised, unless by the law of the land, or the judgment of his peers. There is a similar provision in the constitution of the *United States.* The argument of the late Chief Justice, on this head, it seems, is to be a *petitio principii.* There will be little difficulty, I imagine, in determining between the gentleman and the Chief Justice. whether he who assumes the act to be constitutional, and therefore good, or the one who assumes it to be unconstitutional, and therefore void, may be fairly charged with begging the question. The 33d article, which relates to impeachments, is no more than what the constitution of the *United States* contains ; the 8th amendment of which also provides, that cruel and unusual punishments shall not be inflicted. If ineligibility be a cruel and unusual punishment, as supposed upon the other side, the 8th amendment would repeal that branch of the same constitution which sanctions disqualification as one consequence of a conviction upon impeachment. The several states have gone on, in the face of these provisions in the constitution of the *United States,* imposing disfranchisement and ineligibility in the same manner as is done by the statute in question.

It is said, that punishments should be proportioned to the nature of the offence. This is obviously a mere question of expediency. Indeed, the argument demands what can never be exactly reached by any human code. How is the punishment of any crime to be proportioned to all the circumstances of each particular case ? A man may be guilty of burglary in various degrees, yet the punishment is the same in each. One starving in the streets breaks a house for bread—is he equally guilty with the one who does the same without motive ? Executive clemency, alone, can grant relief, and to that it is reserved.

We are told, that this act is repugnant to that part of the constitution which determines the right of suffrage.   It appears to me that this objection is answered most.conclusively by the late Chief Justice.   The complaint is, that we contract the right of the voter.   All that this proves is, that the person disqualified is placed in the same situation as every other person ; who, if he votes for one that is ineligible, loses his vote.   The alarm, it seems, is, that this sentence of ineligibility may be extended to every member of the community.   But what is the nature of our government ? It lays out general lines—it can not reach every case, or look to every extreme.   The late Chief Justice places this matter upon its proper ground.   The legislature have power to pass all laws for the well ordering of society, which are not forbidden by the constitution.   The gentleman supposes extreme cases, to which the legislature never can go.   They must enjoy an extensive discretion in every government ; and, it is true, that any system may be abused ; but by reasoning against the possible abuse of power, we deny all power except that of Deity.   Even the christian religion has been perverted to the worst of purposes.   When we come to the point supposed by the gentleman, there is a redeeming spirit in the people, which will restrain and correct those who feel power and forget right.

*Butler*, in reply.   The amount of the gentleman's argument, as derived from other states, is, that because they have violated the constitution, or the fundamental principles of government, we may, therefore, do the same.   It is not necessary to look beyond our own constitution, and that of the *United States.*   But when we do, we find but two classes of cases in which disfranchisement and ineligibility have been sanctioned by statutes.   These are cases of duelling and bribery, from which we must except all the statutes which passed under the colonial governments, they being instances which certainly carry no force, as examples, to legislators who act under the new constitutions.   Beside, the statutes. passed upon these subjects since, must stand or fall by the provisions of the particular state constitution under which

they passed. Some of the constitutions in the neighboring states are broader than ours on this head. Their laws, too, in relation to duelling, have doubtless grown out of the effervescence of the moment, like ours ; and they have never been enforced. In *Maryland*, the legislature has lately repealed such a law, as unconstitutional. All the state laws, in relation to duelling, probably stand on the same ground both of principle and policy. This is the first time the question upon their validity has been raised any where ; and, as to bribery, though the constitution gives no express authority to punish it by *disfranchisement* or ineligibility, there are sufficient indications, in almost all the constitutions, of an intent to confer such a power. Indeed, it is consistent with the very terms of some of them. The question, however, as to the validity of any of these statutes, has not been judicially passed upon, and I deny the force of such proof.

When I urged the danger that the rights of suffrage might be impaired or destroyed by multiplying cases of ineligibility, I expected to be met with the objection of extreme cases. The Attorney General does not and will not deny, that if the legislature have power, in the case under consideration, to inflict the punishment of ineligibility, they have it equally in all others, in assault and battery or any other common law offences. Can the consequence suggested, then, be properly called an extreme case ? It seems that our security must lie in the patriotism and intelligence of the legislature, or the control of their constituents. We say, the people have not chosen to rest it there. The security of their liberties reposes upon the provisions of their constitution, express or implied—a surer and better foundation.

I thank the Attorney General for his allusion to the abuses of the christian religion, in one of his illustrations, and will pursue it. I put the case of the legislature annexing this punishment of ineligibility to the violation of the christian sabbath, or to profane swearing. Is it supposing an extreme case, to say that they may, within 40 years, impose this disability as a punishment for those very common offences ? Had the same thing been supposed, when the original constitution was adopted, in relation to this offence of

sending a challenge, might it not have been treated as an extreme case with just as much propriety? Yet the force of circumstances has produced this act, and may, with just as much probability, result in the same thing. with regard to a breach of the sabbath. No doubt there are many who think a violation of the christian sabbath an offence great as sending a challenge, at least, under some circumstances. Suppose a similar statute in relation to the former offence, (it was, too, an offence at common law) could it be maintained as constitutional? If so, the very abuses of religion to which the Attorney General alludes, may return upon us.

ALBANY,
April, 1824.

Barker
v.
The People.

THE CHANCELLOR. The first section of the act of the fifth of November 1816, to suppress duelling, prescribes, that " the person convicted shall be incapable of holding or " being elected to any post of profit, trust or emolument, " civil or military, under this state :" and the objection now made, is, that this punishment is inconsistent with the constitution.

The constitution of the United States provides, that cruel and unusual punishments shall not be inflicted. This provision is one of the amendments to that constitution, which were adopted soon after the constitution itself had been ratified. Like other amendments adopted at the same time, it is a restriction upon the government of the United States, intended to deprive that government of a power, which it had or might claim, under the original constitution. In the language which accompanied these amendments, when they were proposed and adopted; " these farther declaratory and " restrictive clauses were added to the constitution, in or- " der to prevent misconstruction, or abuse of its powers." The solicitude of the people and of the states, then was, not to limit the power of the states, but to limit the power of the union, and by new provisions to give security to rights, which were supposed to be in danger from the new and untried system of national government. The danger apprehended, was by the parts from the new government of the whole; and not by any state from its own government. Each state was then at liberty, as it now is, to provide by its

*The provision in the constitution of the United States, that cruel and unusual punishments shall not be inflicted, is a restriction upon the government of the United States only; and not upon the government of any state.*

own constitution, that cruel and unusual punishments shall not be inflicted by its own government. Accordingly, several of the states, in their constitutions established since the adoption of this amendment to the constitution of the union, have provided, that cruel and unusual punishments shall not be inflicted. This provision is found in the constitutions of Ohio, Tennessee, Indiana, and Maine. The constitutions of Delaware, Kentucky, Mississippi, and Alabama, also established since the adoption of the amendment in question, provide, that cruel punishments shall not be inflicted. Other state constitutions are silent upon the subject of punishments, either cruel or unusual. It is most evident, that the states which have imposed these restraints upon their own governments, conceived, that they were at liberty to do so, or not ; and that in their conception, the constitution of the union, contained no such restraints upon state governments, in the punishment of crimes against states. To consider this amendment as operating upon the several states, would be to render nugatory and null, the like provision in the constitutions of very many of the states ; and at the same time, to force upon all the states which have not adopted such a provision, a rule which they may think inexpedient, and which they at least, have thought unnecessary, in their own internal economy. This provision concerning punishments, is therefore, as a part of the constitution of the union, a restriction upon the government of the union ; and as a part of any state constitution, it is a restriction upon the government of the state which has established it. The constitution of this state, imposes no such restriction upon punishments. Without inquiring whether disqualification to hold office, is a punishment either cruel or unusual, I consider this provision of the national constitution, inapplicable to offences against a state.

The constitution of the United States provides, that no state shall pass any bill of attainder, or ex post facto law ; but that constitution does not regulate the punishment of crimes against a state.

In considering the question before us, it seems to me to be of little importance, whether we examine it, in reference

The constitution of the U. S. does not regulate the punishment of crimes against a state.

to the late constitution of this state, or by that which now exists. The principles and provisions of both instruments, so far as they concern this question, are nearly the same : but as parts of the existing constitution were in force, when this conviction took place, and as it has been urged at the bar, that this judgment is more clearly repugnant to the existing constitution, than it may have been to the preceding instrument, I shall inquire, whether this judgment is, or is not, repugnant to the constitution now in force.

Eligibility to public trusts, is claimed as a constitutional right, which can not be abridged or impaired. The constitution establishes and defines the right of suffrage ; and gives to the electors, and to various authorities, the power to confer public trusts. It declares, that ministers of religion, shall be ineligible to any office ; it prescribes, in respect to certain offices, particular circumstances, without which, a person is not eligible to those stations ; and it provides, that persons holding certain offices, shall hold no other public trust. Excepting particular exclusions thus established, the electors and the appointing authorities are, by the constitution, wholly free to confer public stations upon any person, according to their pleasure. The constitution giving the right of election and the right of appointment ; these rights consisting essentially, in the freedom of choice ; and the constitution also declaring, that certain persons are not eligible to office ; it follows from these powers and provisions, that all other persons are eligible. Eligibility to office, is not declared as a right or principle, by any express terms of the constitution ; but it results, as a just deduction, from the express powers and provisions of the system. The basis of the principle, is the absolute liberty of the electors and the appointing authorities, to choose and to appoint, any person, who is not made ineligible by the constitution. Eligibility to office, therefore, belongs, not exclusively or specially to electors, enjoying the right of suffrage. It belongs equally, to all persons whomsoever, not excluded by the constitution. I therefore conceive it to be entirely clear, that the legislature can not establish arbitrary exclusions from office, or any general regulation requiring

ALBANY,
April, 1824.

Barker
v.
The People.

The state legislature can not establish arbitrary exclusions from office, or any general regulations, requiring qualifications which the state constitution has not required.

ALBANY,
April, 1824.

Barker
v.
The People.

qualifications, which the constitution has not required. If, for example, it should be enacted by law, that all physicians, or all persons of a particular religious sect, should be ineligible to public trusts ; or that all persons not possessing a certain amount of property, should be excluded ; or that a member of the assembly must be a freeholder; any such regulation, would be an infringement of the constitution ; and it would be so, because, should it prevail, it would be in effect, an alteration of the constitution itself. But the question before us, is not at all, of this character. The legislature have made no such general regulation. They have prescribed, that incapacity to hold public trusts, shall be the punishment of a particular crime ; and the question here is, whether they have power to prescribe such an incapacity, as a punishment, or not.

The power of the state legislature, in the punishment of crimes, is not a special grant or limited authority, but a part of the legislative or sovereign power of the state, to maintain social order, and to take life, liberty and all the rights of both, when the sacrifice is necessary.

The power of the legislature in the punishment of crimes, is not a special grant, or a limited authority to do any particular thing, or to act in any particular manner. It is a part of " the legislative power of this state," mentioned in the first sentence of the constitution. It is the sovereign power of a state, to maintain social order, by laws for the due punishment of crimes. It is a power to take life, and liberty, and all the rights of both, when the sacrifice is necessary to the peace, order, and safety of the community. This general authority is vested in the legislature, and as it is one of the most ample of their powers, its due exercise is among the highest of their duties. When an offender is imprisoned, he is deprived of the exercise of most of the rights of a citizen ; and when he suffers death, all his rights are extinguished. The legislature have power to prescribe imprisonment or death, as the punishment of any offence. The rights of a citizen, are thus subject to the power of the state, in the punishment of crimes ; and the restrictions of the constitution upon this, as upon all the general powers of the government, are, that no citizen shall be deprived of his rights, unless by the law of the land or the judgment of his peers, and that no person shall be deprived of life, liberty or property, without due process of law.

The constitution has, in one case, limited punishment. When an officer of the state, is convicted upon impeachment, the judgment can not extend farther than removal from office and disqualification to hold office. This provision stands here, a restriction, not an authority. As the punishment is not to extend farther, than removal and disqualification, the sense of the terms, and the known course of proceedings in the country from which we derive the history and practice of impeachments, both show, that this provision is a mere limitation of a greater power, a power to inflict other punishments, as well as removal and disqualification. Impeachments of public officers, a peculiar species of accusation, made and tried in a peculiar manner, are to extend no farther in their effect, than to discharge an officer from his trust, and to render him incapable of holding office ; but if the cause, for which the officer is thus punished, is a public offence, he may be also, indicted, tried, and punished, according to law ; the constitution leaving the definition of the offence, and its particular punishment, in this case, as in all others, to the general power of the legislature. This part of the constitution concerning judgment on impeachments, is therefore, a limitation of the power of the court for the trial of impeachments ; and not a restriction upon the general power of the legislature over crimes.

The power of the state over crimes, is thus committed to the legislature, without a definition of any crime, without a description of any punishment to be adopted, or to be rejected, and without any direction to the legislature concerning punishments. It is then, a power to produce the end by adequate means ; a power to establish a criminal code, with competent sanctions ; a power to define crimes and prescribe punishments by laws, in the discretion of the legislature.

But though no crime is defined in the constitution, and no species of punishment is specially forbidden, to the legislature, yet there are numerous regulations of the constitution which must operate as restrictions upon this general power. The whole constitution must be supported ; and all its powers and rules must be reconciled into concord.

ALBANY,
April, 1824.

Barker
v.
The People.

The provision in the state constitution, that the judgment upon impeachment shall not extend farther than a removal from office, and disqualification to hold office, is a restriction, not an authority.

The power of the state legislature, over crimes, is a power to produce the end by adequate means.

But there are numerous regulations in the constitution, which operate as restrictions upon this power.

A law which should declare it a crime, to exercise any fundamental right of the constitution, as the right of suffrage, or the free exercise of religious worship, would infringe an express rule of the system ; and would therefore, not be within the general power over crimes.   Particular punishments would also encroach upon rules and rights established by the constitution.   Though the legislature have an undoubted power to prescribe capital punishment, and other punishments which produce a disability to enjoy constitutional rights, yet a mere deprivation of rights, would, even as a punishment, be, in many cases, repugnant to rules and rights expressly established.   Many rights are plainly expressed, and intended to be fundamental and inviolable, in all circumstances.   A law enacting that a criminal should, as a punishment for his offence, forfeit the right of trial by jury, would contravene the constitution ; and a deprivation of this right, could not be allowed, in the form of a punishment.   Any other right thus secured, as universal and inviolable, must equally prevail against the general power of the legislature to select and prescribe punishments.   These rights are secured to all ; to criminals, as well as to others ; and a punishment consisting solely, in the deprivation of such a right, would be an evident infringement of the constitution. Any punishment operating as an infringement of some rule thus expressly established, or some right thus expressly secured, would be unconstitutional ; and all punishments which do not subvert such rules and rights of the constitution, are within the scope and choice of the legislative power.

Many rights
are intended to
be fundamental and inviolable.
Examples.

But while many rights are consecrated, as universal and inviolable, the right of eligibility to office, is not so secured.   It is not one of the express rules of the constitution, and is not declared as a right, or mentioned in terms as a principle, in any part of the instrument.   Important as this right is, it stands, as the right to life itself stands, subject to the general power of the legislature, over crimes and punishments.   As a right flowing from the constitution, it can not be taken away by any law declaring that classes of men, or even a single person not convicted of a public offence, shall be ineligible to public stations ; but as a right not expressly secured by the consti-

tution, it may be taken from convicted criminals when the legislature in their plenary power over crimes, deem such a deprivation, a necessary punishment. To say this, is to say in substance, that the right in question, may be forfeited by crimes, when the legislature so direct. If this right is taken from none but malefactors, in punishment for offences declared by law, and ascertained in the due course of justice, the sense of the whole constitution, is maintained : and the public, it may be presumed, will not find their choice of agents much abridged by the exclusions from office, which their own legislators, courts and juries may thus add to those specified in the constitution.

Each house of the legislature is the judge of the qualifications of its own members ; and it is said, that this provision of the constitution, is infringed, by the disqualification in question. The sense of this provision is, that each house shall decide upon the qualifications of its own members without interference or control from any other authority ; but this part of the constitution does not define any qualification which shall be allowed or required by either house. The only qualification made requisite by the constitution for a senator, is that he shall be a freeholder ; and in respect to members of the assembly, no qualification whatever is required by the constitution. Whether the legislature can exclude from public trusts any person not excluded by the express rules of the constitution, is the question which I have already examined : and according to my views of that question, there may be an exclusion by law, in punishment for crimes ; but in no other manner, and for no other cause. If then a disqualification for crime, is constitutional, each house of the legislature, bound to support the constitution, would give effect to the disqualification. But as the authority of each house is exclusive and supreme in all questions concerning the qualifications of its own members, if either house should consider such a disqualification unconstitutional, or for any reason whatever, should disregard it, the opinion of the house would prevail, in respect to the seat and rights of any member declared ineligible by the courts. The disqualification pronounced by the courts, would then

ALBANY,
April, 1824.

Barker
v.
The People

Infliction of disqualification to hold office, as a punishment, is not incompatible with that part of the constitution which provides that each house shall be the judge of the qualifications of its own members.

fail to produce an exclusion from the legislature ; but it would nevertheless, be effectual to exclude from all other public stations. Its effect in respect to all other public employments, must be decided by the tribunals of justice. Thus, the same question, must for different objects, receive decisions from different jurisdictions ; and under one constitution and one system of laws, the same decision may be expected from all the public authorities. But if the senate or the assembly on one side, and the courts of justice on the other, should make opposite decisions respecting such a disqualification, both decisions would prevail in different respects. The power of each house of the legislature to judge of the qualifications of its own members, does not determine or illustrate what is, or is not a qualification; the statute to suppress duelling, does not propose to deprive, nor can any law deprive the several houses of the legislature of their exclusive jurisdiction ; and this part of the constitution, is therefore not infringed by the judgment of disqualification now in question.

It has been strongly urged, that the power to prescribe this species of punishment may be abused. That such a power may be abused, can not be denied ; since all power entrusted to men, is subject to abuse. The power to declare crimes and prescribe punishments, is high, indefinite, and discretionary ; and therefore affords ample room for abuse. Yet the legislature by their acts, instead of any tendency to severity, show a strong disposition to mildness, in the use of their power over crimes and punishments. That disqualification to hold public trusts, will become a frequent punishment, seems not probable ; the legislature having hitherto adopted this punishment, only in the two cases of bribery and duels. But whatever may be the danger of abuse, the punishment itself is not unconstitutional. The remedy for abuse of the legislative power, in enacting laws which may be unwise, while they are not unconstitutional, is not in the courts of justice. It is found in other parts of the system, in frequent elections and in the due course of the legislative power itself, which alike enacts and repeals laws, in pursuance of public opinion. That this punish-

ment is little consonant to the genius of our institutions ; that there is an ample choice of punishments for crimes, without adopting this ; that the electors and the appointing powers should enjoy their free choice for public stations, without legal exclusions even for crimes, are reasons of great force ; but they are reasons upon which the legislature must decide.

ALBANY,
April, 1824.

Barker
v.
The People.

My opinion upon the whole case, is, that the punishment of incapacity to hold office, prescribed by the act to suppress duelling, is not inconsistent with the constitution ; and that this cause has been rightly determined by the courts, through which it has passed.

BOWMAN, BURT, CLARK, DUDLEY, EARLL, GARDINER, HAIGHT, LYNDE, MALLORY, M'CALL, M'INTYRE, REDFIELD, SUDAM, THORN, WARD, WOOSTER and WRIGHT, Senators, concurred.

For affirmance 13 ; for reversal, 1.

OGDEN, Senator, dissented.